Docket No. 23-01809
United States Court of Appeals
for the Seventh Circuit


COMMODITY FUTURES TRADING COMMISSION,

Plaintiff - Appellee,
v.

JAMES A. DONELSON,

Defendant - Appellant.

---

## Defendant-Appellant's Brief on Appeal

---

On Appeal from a Judgment of the
United States District Court
for the Northern District of Illinois
Hon. Thomas M. Durkin

---

Charles McElvenny
Attorney For Defendant-Appellant
LAW OFFICE OF CHARLES E. MCELVENNY
Suite 1133
1509 Waukegan Road
Glenview, IL 60025
847-544-8841

Save As　　Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 23-1809

Short Caption: CFTC v. James Donelson

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[ ]   **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

James A. Donelson

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Charles E. McElvenny (Law Office of Charles E. McElvenny), James M. Falvey (Law Office of James Falvey), Laurence M. Landsman (Latimer LeVay Fyock, LLC), Nicholas P. Iavarone (The Iavarone Law Firm)

(3)    If the party, amicus or intervenor is a corporation:

     i)      Identify all its parent corporations, if any; and

         N/A

     ii)      list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

         N/A

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: _____    Date: May 17, 2023

Attorney's Printed Name: Charles E. McElvenny

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes [✔]    No [ ]

Address: 1509 Waukegan Road #1133, Glenview, IL 60025

Phone Number: 847-544-8841      Fax Number: N/A

E-Mail Address: charlie@cemlawfirm.com

rev. 12/19 AK

# Table of Contents

Table of Authorities.................................................................................iii

Preliminary Statement and Statement of Jurisdiction .............................1

Statement of the Issues ............................................................................2

Statement of the Case ..............................................................................4

Standard of Review ................................................................................11

Summary of the Argument .....................................................................11

ARGUMENT ..........................................................................................12
      SUMMARY JUDGMENT IS UNWARRANTED: THE DETERMINATION
        IS INFECTED WITH ERRORS OF LAW AND FACTUAL ISSUES
        ARE PRESENTED THAT CAN ONLY BE RESOLVED BY A JURY
        12
      A. Introduction....................................................................................12
      B. Options Fraud.................................................................................12
          1.  Claim that Donelson Fraudulently Omitted the Fact That
            Almost All Long Leaf Customers Who Participated in
            Their Lost Money on Their Investments.....................14
          2. Claim That Trading Histories Provided by Long Leaf to
            Customers Were "False and Misleading".....................19
          3. Claim of Alleged Failure to Disclose Lack of Trading
            Experience..................................................................20
          4. Liability for Statements Made by Long Leaf APs Telling
            Customers about "Target" Return Rates of 6 to 12
            Percent........................................................................21
      C. CTA Fraud (Counts II and III) ......................................................22
      D. Failure to Register as a CTA..........................................................24
      E.  Failure to Make Required CTA Disclosures.................................26
      F.  Failure to Register as an AP............................................................26

Conclusion .............................................................................................27

Certificates .......................................................................................28-29

Proof of Service…………………………………………………………30

Circuit Rule 30(d) Statement…………………………………………31

# Table of Authorities

Abrams v. Baker Hughes Inc., 292 F.3d 424 (5th Cir. 2002) ............17

Basic Inc. v. Levinson, 485 U.S. 224 (1988)....................................14, 16

Broad v. Rockwell Int'l Corp., 642 F.2d 929 (5th Cir.), cert. denied, 454 U.S. 965 (1981) ...............................................................................................18

CFTC v. Commonwealth Fin. Grp., 874 F. Supp. 1345 (S.D. Fla. 1994) ..............13

CFTC v. Dro Kholamian & Blue Star Trading, LLC, 2022 U.S. Dist. LEXIS 91601, 2022 WL 1577229 (N.D. Ill. March 21, 2022) ...........................13

CFTC v. Int'l Fin. Servs. (N.Y.), Inc., 323 F. Supp. 2d 482 (S.D.N.Y 2004) .........12

CFTC v. McLaurin, 1996 U.S. Dist. LEXIS 9417, 1996 WL 385334 (N.D. Ill. July 3, 1996)....................................................................................................20

CFTC v. R.J. Fitzgerald & Co., Inc., 310 F.3d 1321 (11th Cir. 2002) .......................................................................................... 12, 13, 16, 17

CFTC v. Risk Capital Trading Group, Inc., 452 F. Supp. 2d 1229 (N.D. Ga. 2006) ....................................................................................................17

CFTC v. Rosenberg, 85 F. Supp. 2d 424 (D.N.J. 2000) .........................................20

CFTC v. Std. Forex, Inc., No. 1:93-cv-88, 1993 WL 809966, at *21 (E.D.N.Y. Aug. 9, 1993)....................................................................................................13

CFTC v. Weinberg, 287 F. Supp. 2d 1100 (C.D. Cal. 2003) ...................................13

Commodity Futures Trading Commission v. AVCO Financial Corp., 979 F. Supp. 232 (S.D.N.Y. 1997)................................................................................23

Commodity Trend Serv. v. CFTC, 233 F.3d 981 (7th Cir. 2000) ...........................22

Concerning Guided Accounts of Introducing Brokers & Futures Commission Merchants, CFTCLTR No. 95-82, 1995 WL 707862 (Sept. 19, 1995) .................25

Ernst & Ernst v. Hochfelder, 425 U.S. 185 (1976)................................................17

Flaxman v. Commodity Futures Trading Com., 697 F.2d 782 (7th Cir. 1983) .......26

Gray v. Wesco Aircraft Holdings, Inc., 847 F. App'x 35 (2d Cir. 2021) ................21

In re Cardinal Health Inc. Sec. Litigations, 426 F. Supp. 2d 688 (S.D. Ohio 2006)
.................................................................................................................16

In re Ocera Therapeutics, Inc. Secs. Litig., 806 F. App'x 603 (9th Cir. 2020)........21

In the Matter of Roger J. Wright., 2003 CFTC LEXIS 24, * 129,  Comm. Fut. L.
Rep. (CCH) P29,412 (February 25, 2003) ...........................................................25

Kisor v. Wilkie, 139 S. Ct. 2400 ( 2019) .................................................................26

Matrixx Initiatives, Inc. v. Siracusano, 563 U.S. 27 (2011) ...................................15

Monieson v. Commodity Futures Trading Comm'n, 996 F.2d 852 (7th Cir. 1993)
.................................................................................................................24

Montilla v. I.N.S., 926 F.2d 162 (2d Cir. 1991).......................................................25

Purdy v. Commodity Futures Trading Com., 968 F.2d 510 (5th Cir. 1992)...........27

R & W Tech. Servs., Ltd. v. CFTC, 205 F.3d 165 (5th Cir. 2000) .............11, 14, 15

Ryan v. CFTC, 145 F.3d 910 (7th Cir. 1998) .........................................................11

SEC v. Kirkland, 521 F. Supp. 2d 1281 (M.D. Fla. 2007) ...............................21, 22

Shapiro v. UJB Fin. Corp., 964 F.2d 272 ...............................................................16

Slusser v. CFTC, 210 F.3d 783 (7th Cir. 2000) ......................................................12

Su v. Johnson, 68 F.4th 345 (7th Cir. 2023) ...........................................................11

TSC Industries, Inc. v. Northway, Inc., 426 U.S. 438 (1976) ................................16

Taucher v. Born, 53 F. Supp. 2d 464 (D.D.C. 1999) ..............................................23

Udiskey v. Commodity Resource Corp., 1999 CFTC LEXIS 60, *61, Comm. Fut.
L. Rep. (CCH) P27,599 ...................................................................................25

United States Commodity Futures Trading Comm'n v. Kratville, 796 F.3d 873 (8th
Cir. 2015)...........................................................................................19, 21

Zall v. Std. Ins. Co., 58 F.4th 284 (7th Cir. 2023) ........................................11

## FEDERAL STATUTES

7 U.S.C. § 13c(b) ............................................................................3, 24

7 U.S.C. § 1a(12)(A)(I) .....................................................................22

7 U.S.C. § 6b(a)(2)(A) ...................................................................12, 13

7 U.S.C. § 6c(b) ..............................................................................12

7 U.S.C. § 6k ...................................................................................26

7 U.S.C. § 6m(1) ..............................................................................24

7 U.S.C. § 6o(1) ...............................................................................22

7 U.S.C. § 6o(1)(B) ...........................................................................22

7 U.S.C. § 13a-1(a) (2018) ...................................................................1

17 C.F.R. § 4.31(a), (b)......................................................................26

17 C.F.R. § 240.10b-5 .......................................................................15

17 C.F.R. § 4.14(a)(6).........................................................................24

17 C.F.R. § 4.41(a) ...........................................................................22

17 C.F.R. § 5.2(b) .............................................................................13

17 C.F.R. § 5.2(b)(1) .........................................................................12

17 C.F.R. § 33.10.............................................................................12

28 U.S.C. § 1291 ........................................................................................1

28 U.S.C. § 1331 ........................................................................................1

28 U.S.C. § 1345 ........................................................................................1

### Preliminary Statement and Statement of Jurisdiction

JAMES A. DONELSON appeals from a judgment of the United States District Court for the Northern District of Illinois (Hon. Thomas M. Durkin, D.J.), entered March 29, 2023, which, among other things, enjoined and prohibited him from engaging in the conduct described in the Complaint, directed him to pay restitution in the amount of $2,376,738, and disgorgement in the amount of $1,235,413. R. 125.

The action was brought by plaintiff under Commodity Exchange Act ("Act"), 7 U.S.C §§ 1- 26 (2018), and accompanying Commission Regulations ("Regulations"), 17 C.F.R. pts. 1-190 (2019), alleging violations of the Act and Regulations.

The district court had federal question jurisdiction under 28 U.S.C. § 1331, and supplemental jurisdiction pursuant to 28 U.S.C. § 1345 and Section 6c(a) of the Act, 7 U.S.C. § 13a-1(a) (2018). Notice of appeal was filed on April 27, 2023, and is thus timely. Fed.R.App.P.4(a)(1)(B). This Court has jurisdiction over the appeal from the final judgment pursuant to 28 U.S.C. § 1291.

## Statement of the Issues

Plaintiff was granted summary judgment on six claims against Appellant Donelson: three fraud claims: (1) options fraud; (2) commodity trading advisor fraud; and (3) fraudulent advertising by a Commodities Trading Advisor or its principal; and three claims seeking to hold him liable for various non-scienter regulatory violations.

The primary question on appeal is whether summary judgment was properly granted. To determine whether it was, poses several additional issues, namely:

1. Plaintiff contended, and the district court agreed, that Appellant was culpable for, among other things, a failure to disclose the prior track record of the company of which he had just become the CEO. This raises the question whether the Appellant had a duty to disclose certain information as charged by plaintiff or is disclosure required only when necessary to make statements made, in the light of the circumstances under which they were made, not misleading.

2. Is the proper test for scienter whether the danger of misleading customers must be either known or so obvious that the defendant must have been aware of it?

3. Whether returns showed to customers that stated they were *hypothetical* and that there was a *target* range of return, can be found to be false and misleading, as held by the district court.

4. Whether in order to be a commodity trading advisor, or "CTA," the entity must have discretion over a customer's account.

5.  Whether to establish controlling person liability under 7 U.S.C. § 13c(b), it must be shown that the individual had both control and a lack of good faith or knowing inducement of the acts constituting the violation.

### Statement of the Case

Plaintiff, Commodity Futures Trading Commission (CFTC), is federal regulatory agency which administers and enforces the Commodity Exchange Act and accompanying regulations. Long Leaf is an Illinois corporation registered with the National Futures Association ("NFA") as an "introducing broker." R. 96-1 ¶ 3. James Donelson was Long Leaf's CEO for a portion of the relevant time. R. 96-1 ¶ 4, 5.

By way of background, on a designated contract market, an introducing broker, or "IB," cannot place orders. Instead, an IB refers its clients to a futures commission merchant ("FCM"). Customers then establish trading accounts on a market. R. 96-1 ¶ 10. An IB may generate revenue through commissions when a customer places a trade (or the IB places a transaction on behalf of the customer) in an account with the FCM. R. 96-1 ¶ 11. During the pertinent time period, Long Leaf introduced clients to FCMs and received commissions for orders executed in client accounts. R. 96-1 ¶¶ 13, 21.

In contrast to an IB, a commodity trading advisor, or "CTA," serves as a form of financial advisor for clients, advising them (for compensation or profit) on the purchase or sale of futures contracts or options. A CTA may be an individual or an organization. Long Leaf was never registered as a CTA. R. 96-1 ¶ 3. A person who functions as a "salesperson" for a firm (whether an IB, CTA, or other category), soliciting customers or orders, is known as an "Associated Person" of

the firm, or "AP."

During the pertinent time period, spanning about four years, Long Leaf recommended transactions to consumers as part of a "trading program" known as the "Time Means Money" or "TMM" program. R. 96-1 ¶ 14; R. 97 ¶ 7. Customers who consented to participate in TMM typically received four trade suggestions per month from Long Leaf. R. 96-1 ¶ 15.

At least some of these recommendations involved futures contracts with "out-of-the-money" options. R. 96-1 ¶16; R. 97 ¶ 8. R. 96-1 ¶16; R. 97 ¶  8. An options contract is considered "out of the money" if it lacks intrinsic value, meaning that if its owner exercised it, they would pay more than the current market value for a stock (in the case of a call option) or sell a stock for less than its current market value (in the case of a put option). https://www.thestreet.com/dictionary/o/out-of-the-money.

This is an appropriate strategy for some investors. "The OTM option is one of the traders' primary choices when trading options. This objective is determined by the amount of money the trader is willing to risk, the risk tolerance of the trader, and the specific expectations they have for the underlying stock. As a result, a trader that chooses this option can benefit from a range of strategies."

https://www.nasdaq.com/articles/5-tips-for-trading-out-of-the-money-options.

The trading structure (the collection of calls and puts traded together) was the same for each customer who received these recommendations, though the

number of contracts recommended could vary. R. 96-1 ¶ 17; R. 97 ¶ 9. Customers with greater equity (i.e., more money in their accounts) were advised to trade more contracts, whereas those with less equity were advised to trade fewer. R. 79-1 ¶ 19.

Long Leaf's APs typically provided recommendations over the phone or via email to Long Leaf's TMM customers. R. 96-1 ¶ 19; R. 97 ¶ 10. Long Leaf APs instructed clients to respond "yes" via text message or email to accept the suggested transactions. R. 96-1 ¶19; R. 97 ¶ 11. Long Leaf would then forward customer orders to its FCM, which would then execute the orders on the exchange in accordance with R. 96-1 19 and R. 97 11. R. 96-1 ¶ 20; R. 97 ¶ 12.

Approximately 80 percent of Long Leaf's clients participated in TMM. R. 96- 1 ¶ 23. Approximately 80% of the time, these consumers adopted Long Leaf's trading recommendations. R. 96-1 ¶ 24.

According to the CFTC, TMM was a catastrophic program for Long Leaf's clients. The vast majority of Long Leaf customers who invested in TMM lost money. R. 79-1 ¶ 33.

Long Leaf's prior CEO Timothy Evans was aware of consumer losses caused by TMM. He received customer account statements indicating losses as well as customer complaints regarding account performance. R. 79-1 ¶ 35.

Other Long Leaf APs received comparable consumer loss information. R. 79- 1 ¶ 36. Customers were not informed of these losses, however. R. 79-1 ¶ 41.

Evans instructed Long Leaf's APs not to provide information about TMM's

performance history, and if customers requested such information, they should inform them that company policy prohibited Long Leaf from doing so. R. 79-1 ¶ 42.

Appellant Donelson became CEO of Long Leaf in December 2017. As Long Leaf's CEO, he had the authority to direct the company's administration and policies. R. 96-1 ¶ 4. He registered as a Long Leaf AP for the first time in June 2018 and remained registered until December 2019. R. 96-1 ¶ 5; R. 79-1 ¶ 6. During Donelson's tenure, nearly all Long Leaf patrons who participated in TMM lost money. R. 96-1 ¶ 27.

Shortly after commencing work at Long Leaf, Donelson began receiving daily customer account statements. These statements demonstrated that the majority of TMM customers lost money. R. 96-1 ¶ 32. In January of 2018, Donelson conducted a "five-month look-back" and discovered that clients were "consistently losing money." R. 96- 1 ¶ 33. He also monitored the real-time performance of Long Leaf's suggested transactions. R. 96-1 ¶ 35.

During his tenure, Donelson received emails and phone calls from consumers who were upset that the value of their accounts had decreased. R. 96-1 34, 36. In accordance with R. 96-1 34, 36, Long Leaf marketed the TMM program to the general public via its website, while its APs also solicited consumers through oral and written presentations. R. 96-1 ¶¶ 38-39.  The aim for APs was to make 200 contacts per day to prospective clients. R. 96-1 ¶ 40. Monthly, Donelson evaluated

all written correspondence and call recordings between Long Leaf APs and clients. R. 96-1 ¶¶ 41-42.

Donelson was aware that Long Leaf's APs told prospective clients that "76.5 percent of options expired worthless," which "increased the customer's statistical likelihood of success," and that "one of Long Leaf's core values was to create a strong return for customers." R. 96-1 ¶¶ 43-44. Long Leaf APs were directed by Donelson to inform clients that their "strategies" targeted a 6 to 12 percent annual return. R. 96-1 ¶¶ 45-46.

During Donelson's tenure as CEO, Long Leaf customers, including prospective customers, were not informed that the majority of TMM program participants lost money. R. 96-1 ¶ 47. By the time of a February 2018 sales meeting, TMM's performance was "terrible." R. 79-1 ¶ 45. Consistent with the policy in place under the previous management, APs were instructed not to provide consumers with any information in response to inquiries about past performance. R. 96-1 ¶¶ 48-50.

Donelson testified that he was currently employing a new trading model. R. 96-1 ¶ 48. Long Leaf APs were given "rebuttal" templates instructing them to respond to queries for past performance data by asserting that the "structure of the program" was "unmatched" and the reason for its success. R. 79-1 ¶ 43. The policy prohibiting the disclosure of past performance to customers and prospective customers remained in effect until June 2019.

R. 96-1 ¶ 51.

On February 22, 2018, Donelson informed Long Leaf customers (via its APs) that he had "ten years of financial and business development experience at two of the largest proprietary trading firms" R. 96-1 ¶ 53. However, Donelson had never worked as a trader for any corporation, and his only prior exposure in options trading was a $30,000 loss on a single trade in 2016. R. 96-1 ¶¶ 55-56. Donelson never shared this information with customers or potential consumers of Long Leaf. R. 96-1 ¶ 57.

In addition, the customer letter stated that Donelson was collaborating with Scott Gecas (then an AP for Long Leaf) on "redesigning the trading processes to provide improved returns." R. 96-1 ¶ 53. Donelson and Gecas devised trading recommendations together until Gecas departed Long Leaf in December 2018. Donelson then generated the recommendations on his own. R. 96-1 ¶ 54.

Donelson sent a prospective client an email containing a description of Long Leaf's "bond replacement strategy" on February 18, 2019 indicating "the targeted return for this type of trade is 6-10% per year after fees and commissions." Donelson stated to the client, "The profitability is primarily determined by the time decay variable, which increases the likelihood of success." The email contains a "trade history" detailing seven trades from August 2018 to January 2019 with an average return of 1.68% over the course of seven months. R. 96-1 ¶ 58.

Donelson sent an email to Long Leaf APs on May 20, 2019 with the subject

line "new track record." The email contained a "track record" file that detailed a series of transactions with a total return of $460.23 from July 2018 to May 2019. Donelson sent the email to the APs in order for them to disseminate the "track record" file to prospective and current clients. R. 96-1 ¶ 60. The track record file contains a subset of the transactions that Long Leaf advised and executed during the specified time frame. However, the communication did not reveal that Long Leaf subscribers lost money during the period in question. R. 96- 1 ¶ 61. On other occasions, Long Leaf APs emailed prospective clients with "track record" files that showed positive returns on a series of transactions, despite the fact that Long Leaf customers as a whole had lost money (sometimes hundreds of thousands of dollars) during those respective time periods. R. 96-1 ¶¶ 62-66.

Insofar as pertinent, in its complaint the CFTC Plaintiff was granted summary judgment on six claims against Appellant Donelson: three fraud claims: (1) options fraud; (2) commodity trading advisor fraud; and (3) fraudulent advertising by a Commodities Trading Advisor or its principal; and three claims seeking to hold him liable for various non-scienter regulatory violations.

The District Court granted summary judgment to the CFTC on all causes of action. The final judgment enjoined and prohibited Appellant from engaging in the conduct described in the Complaint, directed him to pay restitution in the amount of $2,376,738, and disgorgement in the amount of $1,235,413. A timely notice of appeal was filed from that judgment.

## Standard of Review

This Court reviews de novo a district court's grant of summary judgment, giving defendant, as the non-moving party in this case, the benefit of conflicting evidence and drawing reasonable inferences in defendant's favor, see *Su v. Johnson*, 68 F.4th 345, 351 (7th Cir. 2023), and "showing no deference to the district court's legal analysis." *Zall v. Std. Ins. Co.*, 58 F.4th 284, 291 (7th Cir. 2023). Because materiality in allegedly fraudulent transactions is a question that courts often encounter, de novo review is proper. *R & W Tech. Servs., Ltd. v. CFTC*, 205 F.3d 165, 169 (5th Cir. 2000) (citing *Ryan v. CFTC*, 145 F.3d 910, 916 (7th Cir. 1998)).

## Summary of the Argument

Appellant was held culpable for, among other things, a failure to disclose the prior track record of the company of which he had just become the CEO. There was no duty to disclose the information Plaintiff charges was omitted because, in the circumstances presented, disclosure is required only when necessary to make statements made, in the light of the circumstances under which they were made, not misleading. Nor were the omissions material and scienter was not established as the danger of misleading customers was not so obvious that the defendant must have been aware of it. Certain returns showed to customers stated they were hypothetical and that there was a target range of return; other returns were actual returns, thus they cannot be found to be false and misleading.

**ARGUMENT**

**SUMMARY JUDGMENT IS UNWARRANTED: THE DETERMINATION IS INFECTED WITH ERRORS OF LAW AND FACTUAL ISSUES ARE PRESENTED THAT CAN ONLY BE RESOLVED BY A JURY**

A. Introduction

Insofar as this Appellant is concerned there are six causes of action, each of which were resolved against him on summary judgment. Each of these causes of action is discussed separately below.

B. Options Fraud

The options fraud cause of action is predicate upon 7 U.S.C. § 6c(b) and 17 C.F.R. § 33.10.

To establish liability for fraud based on misrepresentations and omissions under 7 U.S.C. § 6b(a)(2)(A)-(C), the CFTC must prove that: (1) a misrepresentation, false or misleading statement, or deceptive omission was made; (2) with scienter; and (3) the misrepresentation, false or misleading statement, or deceptive omission was material. *CFTC v. R.J. Fitzgerald & Co., Inc*., 310 F.3d 1321, 1328 (11th Cir. 2002); see also *Slusser v. CFTC*, 210 F.3d 783, 785-86 (7th Cir. 2000); *CFTC v. Int'l Fin. Servs. (N.Y.), Inc*., 323 F. Supp. 2d 482, 499, 502 (S.D.N.Y. 2004).

Similarly, 17 C.F.R. § 5.2(b)(1)-(3) makes it unlawful, in connection with off-exchange retail forex transactions, to use the mails or any means or instrumentality of interstate commerce to cheat or defraud or attempt to cheat or

defraud any person, or willfully deceive any person by any means. 17 C.F.R. § 5.2(b) thus adds only one additional element not found in 7 U.S.C. § 6b(a)(2)(A)-(C): that a defendant's conduct must involve "use of the mails or by any means or instrumentality of interstate commerce." See *CFTC v. Dro Kholamian & Blue Star Trading, LLC*, 2022 U.S. Dist. LEXIS 91601, *16, 2022 WL 1577229 (N.D. Ill. March 21, 2022).

When determining whether a misrepresentation has been made, one must look to the "overall message" and the "common understanding of the information conveyed." *R.J. Fitzgerald*, 310 F.3d at 1328 (internal quotation marks and citation omitted). "Any guarantee of profit and assurance against loss in the context of futures trading is inherently a fraudulent misrepresentation because investments in futures transactions necessarily depend on speculative predictions about an unpredictable future and risk is unavoidable." *CFTC v. Std. Forex, Inc*., No. 1:93-cv-88, 1993 WL 809966, at *21 (E.D.N.Y. Aug. 9, 1993). Failure to inform customers about the inherent risks associated with trading commodity option contracts "while projecting large profits amounts to fraud." *CFTC v. Commonwealth Fin. Grp*., 874 F. Supp. 1345, 1354 (S.D. Fla. 1994); see also *CFTC v. Weinberg*, 287 F. Supp. 2d 1100, 1107 (C.D. Cal. 2003) (finding that "by guaranteeing profits to his investors, [defendant] made material misrepresentations that constitute fraud under Sections 4b(a)(I) and (iii) of the Act").

1.  Claim that Donelson Fraudulently Omitted the Fact That Almost All Long Leaf
Customers Who Participated in Their Lost Money on Their Investments

No misrepresentations have been made concerning this issue. No one contends that Donelson made an *affirmative* statement that was misleading. This is hardly surprising as he never did.

Rather, it is contended that Donelson fraudulently omitted to disclose that all of Long Leaf's customers lost money, and that this omission suffices to satisfy the first element of fraud. It is undisputed, however, that at the time of the alleged material omission, Donelson had been at Long Leaf for only three months, and he was implementing a trading program that was a departure from the previous model.[1] R 96-1, ¶ 48) Although Donelson had no reasonable basis to disclose losses that occurred under prior ownership/control and a distinct trading model, the district Court disagreed. Citing *R & W Tech. Servs., Ltd. v. CFTC*, 205 F.3d 165 (5th Cir. 2000), the district court held that this omission was material as a matter of law. In doing so, the court failed to recognize the difference between duty to disclose and materiality. Specifically, the district court failed to acknowledge that materiality does not automatically create a duty to disclose. "Silence, absent a duty to disclose, is not misleading. . . " *Basic Inc. v. Levinson*, 485 U.S. 224, 239 n.17 (1988). As the Supreme Court noted in dealing with analogous rules concerning stock trading,  Rule 10b-5 "do[es] not create an affirmative duty to disclose any

---

[1] Donelson stopped using the prior trading model and name shortly after he took sole control.

and all material information," and "Disclosure is required under these provisions only when necessary 'to make . . . statements made, in the light of the circumstances under which they were made, not misleading.'" *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44  (2011) (citing 17 C.F.R. § 240.10b-5). *R & W Tech* did not discuss duty to disclose but involved an affirmative misrepresentation: Petitioners offered simulated results that inherently overstated the reliability and validity of their investment system and such claims understated inherent commodity trading risk. This case is different - the disclosure that prior trading models lost money is facially distinguishable from a model that affirmatively misrepresents reliability and validity. The district court adopted Plaintiff's one sentence statement that a reasonable investor would want to know that the prior trading model lost money - but there's no explanation of why that's true. Maybe a reasonable investor wouldn't care how a prior model under different management performed. At the very least it was incumbent on Plaintiff to describe its reasons and for the Court to describe why it found those reasons compelling - a statement that a reasonable investor would consider it important, without more, is conclusory.

With respect to materiality, *R & W Tech* held that whether a misrepresentation or omission is material is "a mixed question of law and fact," involving the "application of a legal standard to a particular set of facts." 205 F.3d at 169. The facts of that case are clearly distinguishable. Petitioners there offered simulated results that inherently overstated the reliability and validity of their

investment system and such claims understated inherent commodity trading risks. In such an instance, a reasonable investor would have found that petitioners' fraudulent misrepresentations were material and made in connection with the commodity futures contract.

An omission is material if there is a "substantial likelihood that the" false statement "or disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic, Inc. v. Levinson,* 485 U.S. 224, 231-32 (1988) (citing *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)). Materiality is an "inherently fact-specific" inquiry. *Basic*, 485 U.S. at 236. As such, a court may only determine that a statement or omission is material as a matter of law if the alleged misrepresentations or omissions are so obviously important to a" reasonable investor "that reasonable minds cannot differ on the question of materiality." *In re Cardinal Health Inc. Sec. Litigations,* 426 F. Supp. 2d 688, 747 (S.D. Ohio 2006) (citing, *inter alia*, citing *Shapiro v. UJB Fin. Corp*., 964 F.2d 272, 281 n. 11 (3d Cir. 1992)).

To the extent that reliance is posited on *CFTC v. R.J. Fitzgerald & Co., Inc*., 310 F.3d 1321, 1328 (11th Cir. 2002), such reliance is misplaced. In that case the defendants hosted a seminar and paid for a television commercial that included a number of affirmative statements. The Court considered those statements when commenting on the fact that 95% of the defendants' customers lost money:

"Given the extremely rosy picture for profit potential painted in the Seminar and in the Commercial, a reasonable investor surely would want to know - before committing money to a broker- that 95% or more of RJFCO investors lost money." *Id* at 1332. No authority is cited by the district court that supports materiality. *R.J. Fitzgerald* is distinguishable for the reasons cited above. *CFTC v. Risk Capital Trading Group, Inc*., 452 F. Supp. 2d 1229 (N.D. Ga.  2006) relied on *Fitzgerald* but again the case is patently distinguishable. There, defendant used a "cold call" telemarketing technique to solicit orders for commodity options from small retail customers. Following a bench trial, the court found that defendant induced customers to invest money by giving a false impression of the probability of large profits. Defendant also failed to disclose to customers that his trading group had a 97 percent loss rate on investments. Similar to its omission argument, Plaintiff simply claims that the omission were material without any argument or analysis. For its part, the district court adopted that position and then did Plaintiff's work by describing why the Court felt the omissions were material.

Scienter is the intent to deceive, manipulate, or defraud. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193-94 (1976). In this context, the "danger of misleading buyers or sellers" must be "either known . . . or . . . so obvious that the defendant must have been aware of it." *Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 430 (5th Cir. 2002). Although the scienter element can be satisfied by proof that the defendant acted with severe recklessness, it is "limited to those highly

unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." *Broad v. Rockwell Int'l Corp.*, 642 F.2d 929, 961-62 (5th Cir.) (en banc), cert. denied, 454 U.S. 965 (1981). In the context of federal securities… scienter is met when Defendant's conduct involves "highly unreasonable omissions or misrepresentations . . . that present a danger of misleading [customers] which is either known to the Defendant or so obvious that Defendant must have been aware of it." *Ziemba v. Cascade Int'l, Inc.,* 256 F.3d 1194, 1202 (11th Cir. 2001). Despite the fact that the Commission never explained how Donelson's conduct arguably meets this standard, the District Judge determined that Donelson must have known about the poor trading performance because Donelson was "intimately familiar" with TMM's poor performance and directed AP's to withhold information based on it. But TMM was no longer the working model - it was not deceptive, manipulative or severely reckless to omit information from a model that was no longer operative and that had no bearing on the new trading model. This is particularly true where the only expert in this case found the new model reasonable. Indeed, the testimony of Donelson's expert, which remains uncontested, precludes a finding of scienter. (Donelson Additional Statement of Facts Par. 1). Put another, the affidavit of John Burnside, an expert in option trading and strategy, creates a question of fact. See R.

96-3. As Burnside observes, the trading strategy practiced under Donelson's leadership could viably turn a profit and was reasonable given the trading environment. And the mere fact that customers lost money under this model cannot be attributed to Donelson but rather to market factors.

2. Claim That Trading Histories Provided by Long Leaf to Customers Were "False and Misleading"

On this point, Donelson's Response to Statement of Facts denies critical facts and specifically contests that any of these cited trades were hypothetical. R 96-1 ¶¶ 58-66. Nonetheless, the district court, citing *United States Commodity Futures Trading Comm'n v. Kratville*, 796 F.3d 873 (8th Cir. 2015) (*Kratville*), concluded that the requisite three elements were established as a matter of law. That case is simply not on point.   In that case, the undisputed evidence demonstrated that the overall message and common understanding of information conveyed to investors while recruiting and managing commodity pools was deceitful because none of the pools earned reported returns through their own trading, *which was what marketing materials represented*, defendant and others made explicitly false representations, and defendant made personal representations that were either false or misleading to investors.

In marked contrast, Appellant used recent trades to demonstrate what was believed to be the viability of their model. And, there is evidence in the record to support it. As recited above, the only expert testimony in this case explicitly states

that the trading strategy provided under Donelson's supervision was viable and it made sense to recommend those positions.

### 3. Claim of Alleged Failure to Disclose Lack of Trading Experience

Again, the cited "undisputed" facts are disputed. R 91-1 ¶¶56-57. Moreover, the district court conceded that the statements were "accurate on its face," but it was nonetheless deceptive "because he was not in a trading position with those companies, and his only actual option trading experience was a substantial loss on a single trade."

The sole authority cited by the district court, *CFTC v. McLaurin*, 1996 U.S. Dist. LEXIS 9417, 1996 WL 385334 (N.D. Ill. July 3, 1996), stands for no such proposition. In that case, the court held that the evidence was undisputed that the trader misappropriated funds of customers by depositing their funds into accounts in which they had no ownership interests, repeatedly making unauthorized disbursements from the accounts for his own use, misstating his qualifications, and misrepresenting his actions to customers and that a reasonable jury would necessarily find that the trader at least attempted to cheat and defraud his customers. The case has never been previously cited for the proposition advanced by the district court. See, e.g. *CFTC v. Rosenberg*, 85 F. Supp. 2d 424, 448 (D.N.J. 2000).

**4. Liability for Statements Made by Long Leaf APs Telling Customers about "Target" Return Rates of 6 to 12 Percent**

The statements make clear that the returns showed to customers in this instance were *hypothetical* and that there was a *target* range of return. R 91-1 ¶¶38-46). Such a projection cannot be false and misleading. *Cf. Gray v. Wesco Aircraft Holdings, Inc.*, 847 F. App'x 35, 37 (2d Cir. 2021) (no economic loss where plaintiffs' alleged initial projections predicted higher implied value of shares than allegedly misleading "updated" projections, and hypothetical bidders would have offered more than actual bidders); *In re Ocera Therapeutics, Inc. Secs. Litig.*, 806 F. App'x 603, 605 (9th Cir. 2020) ("The suggestion that the analysts' opinions of what the shares might be worth were different from what was actually received, let alone that they represented the shares' true value, is too speculative to plead with particularity that shareholders experienced losses—or to plead with particularity that the required causal relationship existed between [defendant's] purported misrepresentations or omissions and those losses.");

In claiming the contrary, the district court cited out of context dicta from *Kratville*. 796 F.3d at 895 and *SEC v. Kirkland*, 521 F. Supp. 2d 1281, 1298 (M.D. Fla. 2007). In *Kratville*, "Kratville misrepresented the Elite Pools's returns and profitability as late as 2006 and 2007, misrepresented the identity of the Elite Pools's brokers, and misrepresented that the Elite Pools owned a proprietary trading system. He hid from investors that pool funds were being sent out of the

country and failed to disclose that the NDBF had ordered the Elite Pools to be closed and pool participants funds to be returned." 796 F.3d at 895. These facts bear no relation to the case at hand. And in *Kirkland*, 521 F. Supp. 2d at 1298, "To entice potential investors, Kirkland and his sales representatives quoted inflated estimated profit margins to potential investors through advertisements, offering packages, and in direct response to investor inquiries. Even though the cash flow sheet and the ads often utilized the single words 'projected' or 'estimated,' projections are nonetheless actionable as misrepresentations if there is no reasonable basis to support them." Here, of course, there is such a reasonable basis, and that reasonable basis remains uncontested.

## C. CTA Fraud (Counts II and III)

The CTA fraud claim in Count II arises under 7 U.S.C. § 6o(1). Section 6o prohibits fraud by a CTA, which the Commodity Exchange Act defines as a person (or entity) who, "for compensation or profit, engages in the business of advising others … as to the value of or advisability of trading in" commodity options, including futures contracts. 7 U.S.C. § 1a(12)(A)(I).

"Section 6o(1)(A) and Regulation 4.41(a)(1) require scienter and do no more than prohibit common law fraud in commodities transactions.*" Commodity Trend Serv. v. CFTC*, 233 F.3d 981, 993 (7th Cir. 2000). 7 U.S.C. § 6o(1)(B); 17 C.F.R. § 4.41(a) punishes "any transaction, practice, or course of business which operates as a fraud or deceit." They do not require scienter, but both are of limited scope. Each

22

prohibits only certain activities that deceive or defraud a CTA's customers, and a showing of negligence is required. *Id.* at 993-994.

The district court concluded that Long Leaf was a CTA[2], but under the relevant criteria, it is not. In *Taucher v. Born*, 53 F. Supp. 2d 464, 478 (D.D.C. 1999), the Court found that certain individuals were not CTAs because they "never engage in individual consultations with their customers regarding their standard advice and recommendations and under no circumstances do they make trades for their customers. Indeed, their customers must go through some other licensed broker before they can act on any of the plaintiffs' recommendations."

The Court distinguished *Commodity Futures Trading Commission v. AVCO Financial Corp.*, 979 F. Supp. 232 (S.D.N.Y. 1997), relied on by the district court: "AVCO not only provided specific buy and sell recommendations; it also provided a telephone number that customers could call to receive additional advice about AVCO's general recommendations and it provided customers 'services by which brokers authorized by AVCO c[old] actually make trades' for AVCO's customers." *AVCO*, 979 F. Supp. at 237. According to the AVCO court, these facts "negated [AVCO's] assertions that AVCO's investment advice [was] entirely impersonal and not characteristic of investment adviser-client relationships meant to be covered by the CEA." *Id.*

---

[2]. It is undisputed that, at all times during the ownership of Long Leaf Trading by Donelson (and prior to Mr. Donelson's ownership), Long Leaf was registered as an Introducing Broker.

Even if it is concluded that Long Leaf was a CTA, Donelson acted in good faith with regard to the trading strategies employed by Long Leaf. To establish controlling person liability under 7 U.S.C. § 13c(b), it must be shown that the individual had (1) control and (2) a lack of good faith or knowing inducement of the acts constituting the violation. See *Monieson v. Commodity Futures Trading Comm'n*, 996 F.2d 852, 860 (7th Cir. 1993). "A controlling person acts in bad faith if he 'did not maintain a reasonably adequate system of internal supervision and control over the [employee] or did not enforce with any reasonable diligence such system.'. . . The controlling person must also act recklessly; negligence alone is insufficient." *Id.* (citations omitted).

At best, negligence is shown here. This is not sufficient to establish that, as a controlling, person Donelson did anything to impute liability to himself.

D. Failure to Register as a CTA

In Count IV, the district court held Donelson liable as a controlling person for Long Leaf's failure to register as a CTA[3], in violation of 7 U.S.C. § 6m(1). In doing so, it held that Long Leaf was a CTA as a matter of law. This is incorrect.

Long Leaf was exempt from the registration requirement under 17 C.F.R. § 4.14(a)(6), which exempts a person or entity from CTA registration requirements if

---

[3]. Obviously, Donelson is only able to argue that Long Leaf was not a CTA during his tenure at Long Leaf from December 2017 through December 2019 (a total of 25 months). He was not present during the Tim Evans ownership of Long Leaf and the records provided to him by Tim Evans were either lacking or nonexistent prior to Mr. Donelson becoming the owner of Long Leaf.

"it is registered under the Act as an introducing broker and the person's trading advice is solely in connection with its business as an introducing broker." That is precisely the circumstance here.

In coming to a contrary conclusion, the district court relied upon *Concerning Guided Accounts of Introducing Brokers & Futures Commission Merchants*, CFTCLTR No. 95-82, 1995 WL 707862, at *2 (Sept. 19, 1995). Since that time, however, the agency has receded from the crabbed construction and correctly so.

In *Udiskey v. Commodity Resource Corp.*, 1999 CFTC LEXIS 60, *61, Comm. Fut. L. Rep. (CCH) P27,599, it explained:

> Rule 4.14(a)'s classes of exempted persons include those who are "registered under the Act as an introducing broker, " provided that "the person's trading advice is solely in connection with its business as an introducing broker. " Similarly, registered APs do not have to register as CTAs if "the person's commodity trading advice is issued solely in connection with its employment as an associated person." 166 CRC was duly registered as an IB and Kleinman was registered as an AP of CRC. Accordingly, if their advisory activities occurred "solely in connection with" CRC's operation as an IB and Kleinman's employment as an AP, then neither was required to register as a CTA.

That view has been reaffirmed. See *In the Matter of Roger J. Wright*., 2003 CFTC LEXIS 24, * 129,  Comm. Fut. L. Rep. (CCH) P29,412 (February 25, 2003).

In any event, the regulation is clear and unambiguous. It is a "long-settled principle that the rules promulgated by a federal agency, which regulate the rights and interests of others, are controlling upon the agency." *Montilla v. I.N.S.*, 926

F.2d 162, 166 (2d Cir. 1991). Moreover, "if there is only one reasonable construction of a regulation—then a court has no business deferring to any other reading, no matter how much the agency insists it would make more sense. Deference in that circumstance would 'permit the agency, under the guise of interpreting a regulation, to create de facto a new regulation.'" *Kisor v. Wilkie*, 139 S. Ct. 2400, 2415 ( 2019) (quoting *Christensen v. Harris County*, 529 U. S. 576, 588 (2000).

At the very least, there are questions of fact as to whether Long Leaf comes within the regulatory exemption.

### E. Failure to Make Required CTA Disclosures

The district court found liability under Count V, which asserts that Long Leaf failed to make certain disclosures as required by 17 C.F.R. §§ 4.31(a), (b), and 4.36(d)(1), and held   Donelson liable as the controlling person. For the reasons stated above, this was erroneous.

### F.  Failure to Register as an AP

7 U.S.C. § 6k requires registration for any person associated with an IB in a capacity that involves the solicitation or acceptance of customers' orders or the supervision of any person or persons so engaged. See *Flaxman v. Commodity Futures Trading Com*., 697 F.2d 782, 784 n.2  (7th Cir. 1983). He registered as a Long Leaf AP for the first time in June 2018 and remained registered until December 2019. R. 96-1 ¶ 5; R. 79-1 ¶ 6.

Late registration is settled by a small fine. See *Purdy v. Commodity Futures Trading Com.*, 968 F.2d 510, 522 (5th Cir. 1992). Late registration filing could not be a cause of any loss to a customer either. *Id.*

## Conclusion

Summary judgment was not warranted on this record. The judgment should be reversed and the matter remanded to the district court for further proceedings.

Dated: July 10, 2023

/s/ Charles McElvenny
Law Office of Charles E. McElvenny
1509 Waukegan Road #1133
Glenview, Illinois 60025
847-544-8841
charlie@cemlawfirm.com

## Certificate of Compliance

This document complies with the word limit of FRAP 32(a)(7)(B)(i) because, excluding the parts of the document exempted by FRAP 32(f) this document contains 6,209 words. This document complies with the typeface requirements of FRAP 32(a)(5) and the type-style requirements of FRAP 32(a)(6).

Dated: July 10, 2023

/s/ Charles McElvenny
Law Office of Charles E. McElvenny
1509 Waukegan Road #1133
Glenview, Illinois 60025
847-544-8841
charlie@cemlawfirm.com

## CIRCUIT RULE 31(e)(1) CERTIFICATION

I, Charles McElvenny, hereby certify that fifteen paper copies of the Appellant's

Brief and Required Short Appendix were sent within 7 days of filing on the Court's ECF

system via hand delivery to:

> United States Court of Appeals for the Seventh Circuit
> 219 S. Dearborn, Room 2722
> Chicago, Illinois 60604

> /s/ Charles McElvenny
> Law Office of Charles E. McElvenny
> 1509 Waukegan Road #1133
> Glenview, Illinois 60025
> 847-544-8841
> charlie@cemlawfirm.com

## PROOF OF SERVICE

This is to certify that I have served two copies of the Appellant's Brief and Required Short

Appendix and one copy of the Separate Appendix upon counsel for COMMODITY

FUTURES TRADING COMMISSION, by July 17, 2023.

/s/ Charles McElvenny
Law Office of Charles E. McElvenny
1509 Waukegan Road #1133
Glenview, Illinois 60025
847-544-8841
charlie@cemlawfirm.com

## CIRCUIT RULE 30(d) STATEMENT

Pursuant to Circuit Rule 30, Appellant submits the following as his Required

Short Appendix. Appellant's Required Short Appendix contains all of the materials

required under Circuit Rule 30(a) and 30(b).

/s/ Charles McElvenny
Law Office of Charles E. McElvenny
1509 Waukegan Road #1133
Glenview, Illinois 60025
847-544-8841
charlie@cemlawfirm.com

### UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| COMMODITY FUTURES TRADING COMMISSION, <br><br>          Plaintiff, <br><br>     v. <br><br> LONG LEAF TRADING GROUP, INC., JAMES A DONELSON, TIMOTHY M. EVANS, JEREMY S. RUTH, and ANDREW D. NELSON, <br><br>          Defendants. | No. 20 C 03758 <br><br> Judge Thomas M. Durkin |

## MEMORANDUM OPINION AND ORDER

The Commodity Futures Trading Commission filed suit against Long Leaf Trading Group and several of Long Leaf's principals and employees, alleging multiple counts of fraud and other violations of the Commodity Exchange Act, 7 U.S.C. §§ 1-26, and accompanying Commission regulations, 17 C.F.R. §§ 1-190. Now before the Court are the CFTC's motions for partial summary judgment on its claims against Long Leaf, James Donelson, and Jeremy Ruth.[1] For the reasons set forth below, the CFTC's motions are granted.

---

[1] Defendant Andrew Nelson was served on July 31, 2020 but never appeared and has since been defaulted. R. 49. Alternative service on Defendant Timothy Evans was executed on November 30, 2021, but to date Evans has not filed an Answer or otherwise appeared. The CFTC characterizes its motions as "partial" because, if they are granted, it says it will subsequently seek injunctive relief and the imposition of civil monetary penalties against the defendants by a separate motion.

Short Appendix001

### Background[2]

The CFTC is an independent federal regulatory agency tasked with administering and enforcing the Commodity Exchange Act and accompanying regulations. Long Leaf is an Illinois corporation registered with the National Futures Association ("NFA") as an "introducing broker." R. 96-1 ¶ 3. James Donelson was Long Leaf's CEO for a portion of the relevant time, while Jeremy Ruth was a Long Leaf employee for a separate portion.

An introducing broker, or "IB," cannot place orders on a designated contract market. Instead, an IB introduces its customers to a futures commission merchant ("FCM"). Customers then open an account for trading on a market. R. 96-1 ¶ 10. One method by which an IB earns revenue is through commissions when a customer places a trade (or when the IB places a trade on the customer's behalf) in an account with the FCM. R. 96-1 ¶ 11. During the relevant time, Long Leaf introduced customers to FCMs and received commissions for orders executed in those customers' accounts in this manner. R. 96-1 ¶¶ 13, 21. In contrast to an IB, a commodity trading advisor, or "CTA," acts as a type of financial advisor for clients, providing advice (for compensation or profit) about the buying or selling of futures contracts or options. A CTA can be a person or an entity. Long Leaf has never been registered as a CTA. R. 96-1 ¶ 3. An individual who acts as a "salesperson" for a firm (be it an IB, a CTA, or

---

[2] The facts set forth here are undisputed except where otherwise indicated. Long Leaf did not respond to the CFTC's motion for summary judgment or statement of facts. Statements of fact supported by citations to the record and to which no defendant has properly responded are deemed admitted pursuant to L.R. 56.1(e).

Short Appendix002

other category of industry player), soliciting customers or orders, is known as an "Associated Person" of the firm, or "AP."

The CFTC's claims addressed in this opinion can be broken into two main categories. The first set of claims concerns alleged fraud perpetrated by the defendants. In general, the CFTC accuses Long Leaf and its agents of defrauding customers with misleading information about profit potential in order to solicit trades and generate commissions for profit. In particular, the CFTC alleges that Long Leaf failed to tell customers that nearly all its clients lost money, and painted an inaccurately rosy picture of the likelihood customers would see positive returns on their investments. The second set of claims is premised on the underlying allegation that while Long Leaf was registered as an IB, it was in fact operating as an unregistered CTA, and that certain Long Leaf employees were themselves acting as CTAs and/or APs in violation of certain applicable regulations governing registration and disclosures to customers.

## I.    Long Leaf's Trading Program

During the relevant time (June 2015 to December 2019), Long Leaf recommended trades to customers as part of a "trading program" it developed known as the "Time Means Money" or "TMM" program. R. 79-1 ¶ 15; R. 96-1 ¶ 14; R. 97 ¶ 7. Long Leaf typically provided four trade recommendations a month to customers who agreed to participate in TMM. R. 96-1 ¶ 15. At least some of those recommendations

involved "out-of-the-money" options on futures contracts.[3] R. 96-1 ¶ 16; R. 97 ¶ 8. The trading structure (meaning the collection of calls and puts traded together) was the same for each customer who received these recommendations, though there could be variance among the numbers of contracts that were recommended. R. 96-1 ¶ 17; R. 97 ¶ 9. For example, customers with greater equity (i.e. money in their accounts) were advised to trade more contracts, while customers with less equity were advised to trade fewer. R. 79-1 ¶ 19.

Long Leaf's APs typically provided recommendations to Long Leaf's TMM customers over the phone or by email. R. 96-1 ¶ 19; R. 97 ¶ 10. Long Leaf APs instructed customers to respond "yes" in a text or email to accept the recommended trades. R. 96-1 ¶ 19; R. 97 ¶ 11. Long Leaf would then forward the customer orders to its FCM, which would place the orders on the exchange for execution. R. 96-1 ¶ 20; R. 97 ¶ 12. Approximately 80% of Long Leaf's customers participated in TMM. R. 96-1 ¶ 23. Those customers accepted Long Leaf's trading recommendations about 80% of the time. R. 96-1 ¶ 24.

As the CFTC describes things, TMM was a disastrous program for Long Leaf's customers, who lost millions of dollars trading with the firm using the program. From June 2015 to December 2019, substantially all Long Leaf customers participating in

---

[3] An "out of the money" option refers to an option contract that lacks intrinsic value because the strike price (the price at which the holder may exercise the option) is above or below the futures market price, depending on whether the contract is a call or put option. *See generally CFTC v. Risk Capital Trading Group, Inc.*, 452 F. Supp. 2d 1229, 1234-35 (N.D. Ga. 2006).

4

TMM lost money. R. 79-1 ¶ 33. TMM participant losses during this period totaled $5,767,145.[4] R. 79-1 ¶ 32. During this same time, Long Leaf received a total of $4,010,994 in commission payments for accounts participating in TMM. R. 79-1 ¶ 34.

Long Leaf's CEO prior to December 2017, Timothy Evans, was aware of customer losses from TMM. He received customer account statements showing losses, as well as complaints from customers about their account performance. R. 79-1 ¶ 35. Other Long Leaf APs received similar information regarding customer losses. R. 79-1 ¶ 36. However, customers were not informed about these losses. R. 79-1 ¶ 41. Evans advised Long Leaf's AP's that they should not provide information about TMM's track record of performance, and that if customers requested such information, they should tell them firm policy did not allow Long Leaf to provide it. R. 79-1 ¶ 42.

## II. James Donelson's Activities

Donelson became Long Leaf's CEO in December 2017. As CEO, he was a principal of Long Leaf and possessed the power to direct its management and policies. R. 96-1 ¶ 4. He first registered as a Long Leaf AP in June 2018, and he remained registered through December 2019. R. 96-1 ¶ 5; R. 79-1 ¶ 6.

Substantially all Long Leaf customers who participated in TMM lost money during Donelson's tenure. R. 96-1 ¶ 27. Those customers' losses while Donelson was CEO totaled $2,376,738. R. 96-1 ¶ 30. During that same period, Long Leaf collected $1,235,413 in commissions from its TMM customers. R. 96-1 ¶ 31.

---

[4] The customer loss figures discussed in this opinion generally include both decline in investment value and commissions paid.

Donelson began receiving daily customer account statements shortly after starting at Long Leaf. Those statements showed that substantially all TMM customers had been losing money. R. 96-1 ¶ 32. In January 2018, Donelson did a "five-month look-back" and found that customers were "consistently losing money." R. 96-1 ¶ 33. He also monitored the performance of Long Leaf's recommended trades in real time. R. 96-1 ¶ 35. During his tenure, Donelson received emails and phone calls from customers complaining that their accounts had lost value. R. 96-1 ¶¶ 34, 36.

Long Leaf marketed the TMM program to the public through the firm's website, while its APs also solicited customers via oral and written presentations. R. 96-1 ¶¶ 38-39. During Donelson's tenure, the goal was for APs to make 200 calls to prospective customers per day. R. 96-1 ¶ 40. Donelson reviewed written communications and recorded calls between Long Leaf APs and customers monthly. R. 96-1 ¶¶ 41-42. Donelson was aware that Long Leaf's APs told prospective customers that "76.5 percent of options expired worthless," which "increased the customer's statistical likelihood of success," and that "one of Long Leaf's values was to create a strong return for customers." R. 96-1 ¶¶ 43-44. At Donelson's direction, Long Leaf APs told customers that their "strategies" targeted a 6 to 12 percent annual return. R. 96-1 ¶¶ 45-46.

While Donelson was CEO, Long Leaf customers, including prospective customers, were not told that substantially all TMM customers lost money in the program. R. 96-1 ¶ 47. By the time of a sales meeting in February 2018, the results from TMM were "very bad." R. 79-1 ¶ 45. Nonetheless, at the meeting, Donelson

6

instructed APs not to provide customers with any information in response to questions about past performance, consistent with the policy that had existed under prior management. R. 96-1 ¶¶ 48-50. Donelson testified he was adopting a new trading model at this time. R. 96-1 ¶ 48. Long Leaf APs were provided with "rebuttal" scripts instructing them to respond to requests for past performance information with claims the "structure of the program" was "unmatched" and the reason it had been so successful. R. 79-1 ¶ 43. The policy against providing customers and prospective customers with information on past performance remained in place until June 2019. R. 96-1 ¶ 51.

On February 22, 2018, Donelson sent a letter to Long Leaf customers (through its APs) that stated he had "10 years of financial and business development experience at two of the largest proprietary trading companies." R. 96-1 ¶ 53. However, Donelson in fact had never worked as a trader for any company, and his only prior experience in options trading was a single trade in 2016 in which he lost $30,000. R. 96-1 ¶¶ 55-56. Donelson never shared this information with Long Leaf customers or prospective customers. R. 96-1 ¶ 57. The customer letter also said Donelson was working with Scott Gecas (then a Long Leaf AP) on "redesigning the trading processes to provide improved returns." R. 96-1 ¶ 53. Donelson and Gecas developed trading recommendations together until December 2018, when Gecas left Long Leaf. After that, Donelson generated the recommendations alone. R. 96-1 ¶ 54.

On February 18, 2019, Donelson sent a prospective customer an email attaching a description of a "bond replacement strategy" used by Long Leaf, which

Short Appendix007

claimed that "the targeted return for this type of trade is 6-10% per year after fees and commissions." Donelson told the customer, "the profitability is primarily driven by the time decay variable and therefore creates a higher probability of success." The email includes a "trade history" reflecting seven trades from August 2018 to January 2019 with an average return of 1.68% over a seven-month period. R. 96-1 ¶ 58. These seven trades represent a portion of the total trades made by Long Leaf on customers' behalf during that period, during which customers lost $323,932 overall. R. 96-1 ¶ 59.

On May 20, 2019, Donelson sent an email to Long Leaf APs titled "new track record." The email included a "track record" file that reflected a series of trades from July 2018 to May 2019 with a total return of $460.23. Donelson sent the email to the APs so they could distribute the "track record" file to prospective and existing customers. R. 96-1 ¶ 60. The track record file reflects a subset of trades that Long Leaf recommended and executed during the relevant period. However, the email did not disclose that Long Leaf customers in total lost $538,618 during that period. R. 96-1 ¶ 61. On other occasions, Long Leaf APs sent emails to prospective customers including "track record" files that showed positive returns on a series of trades, even though Long Leaf customers overall had lost money (sometimes hundreds of thousands of dollars) during those respective periods. R. 96-1 ¶¶ 62-66.

### III.    Jeremy Ruth's Activities

Ruth was an employee of Long Leaf from April 29, 2015 through August 28, 2017. R. 97 ¶ 3. Most of Ruth's customers during his tenure at Long Leaf participated in TMM. R 97 ¶ 14. Ruth's primary responsibility with Long Leaf was to solicit

8

customers—as he testified, to "open up accounts specifically for the Time Means Money program." R. 97 ¶ 15. In doing so, Ruth used a script provided to him by then-CEO Evans. R. 97 ¶ 16. The script included statements about the TMM program's strategies to "drive results;" explaining to customers that by selling four options, "there is a strong statistical likelihood you are going to win 3 of those … giving you a much more predictable path to success." R. 97 ¶ 17. The script continued, "At Long Leaf, we measure our success by our client's [sic] success. As a company, we wouldn't have the ability to work with hundreds of client's [sic] month-after-month for 6 years and oversee millions of dollars if we weren't being profitable for them." R. 96-1 ¶ 18. Ruth also used a PowerPoint presentation that contained slides illustrating the TMM program and depicting an "annual return" of 12%. R. 97 ¶ 19.

Ruth made statements consistent with this script in various calls with prospective customers. For example, in a January 12, 2016 call with a prospective customer, Ruth explained that, using the TMM program, "following that math over those four assets, on the three, you can expect it to be right; in the long run it would generate 1500; and the one you're wrong losing 1,000; and that would leave you with a net of 500 bucks." Ruth continued, "Now we want to continue that process month after month … continue that income-generating process, you know you carry that out for a year, you're looking at 6,000 dollars, which is a 6% return…. Obviously these positions are scalable so it's very easy to duplicate that to accomplish 12% on an annual basis." R. 97 ¶ 21. In another call with a prospective customer, Ruth said the TMM program was based on the idea that "if you sell four options, there is a strong

9

statistical likelihood you will win three of them, giving you a much more predictable path to success." R. 97 ¶ 22. He told another prospective customer Long Leaf was able to create "a predictable path to arrive a specially targeted return." When the customer said, "you got to be good to achieve that," Ruth replied, "we are." R. 97 ¶ 23. Ruth went on to tell the prospective customer that most of his clients made money, and that he could verify that fact by reviewing his clients' results on his computer screen. R. 97 ¶¶ 24-25.

Ruth received account statements for his customers every day the markets were open. R. 97 ¶ 29. The CFTC contends that these statements revealed that substantially all Ruth's customers participating in the TMM program lost money. Ruth says that he did not know the outcome of his customers' trades for most of his tenure with Long Leaf, that he did not know how to interpret the statements, and that they were inaccurate because an option's performance is not determined until the day it is closed. R. 97 ¶¶ 27-29. He tracked the results of Long Leaf's trading recommendations for a period of months in 2017, showing net losses on the trades. R. 97 ¶¶ 37-40. Ruth also "frequently" received calls and emails from customers complaining about their account performance. R. 97 ¶ 32; R. 76-21, at 155:18-24. Nonetheless, Ruth did not disclose information on past performance of the TMM program to customers or prospective customers, nor did he tell them that substantially all customers in the program lost money. R. 97 ¶ 43.

Ruth was paid a total of $301,541.39 for his work at Long Leaf. R. 97 ¶ 46. This compensation was primarily based on commissions charged to customers. *Id*. After

Short Appendix010

the first few months of work, Ruth's compensation consisted entirely of a percentage of the commissions he helped to generate. R. 97 ¶ 47.

## Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). To defeat summary judgment, a nonmovant must produce more than a "mere scintilla of evidence" and come forward with "specific facts showing that there is a genuine issue for trial." *Johnson v. Advocate Health and Hosps. Corp.*, 892 F.3d 887, 894, 896 (7th Cir. 2018). The Court considers the entire evidentiary record and must view all the evidence and draw all reasonable inferences from that evidence in the light most favorable to the nonmovant. *Horton v. Pobjecky*, 883 F.3d 941, 948 (7th Cir. 2018). The Court does not "weigh conflicting evidence, resolve swearing contests, determine credibility, or ponder which party's version of the facts is most likely to be true." *Stewart v. Wexford Health Sources, Inc.*, 2021 WL 4486445, at *1 (7th Cir. Oct. 1, 2021). Ultimately, summary judgment is warranted only if a reasonable jury could not return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## Analysis

### I.    Claims against Donelson

The CFTC seeks summary judgment on six claims against Donelson. The first three are fraud claims: (1) options fraud; (2) commodity trading advisor fraud; and

11

(3) fraudulent advertising by a CTA or principal thereof. Counts 4 through 6 seek to hold Donelson liable for various non-scienter regulatory violations.

### a. Options Fraud

The options fraud claim arises under 7 U.S.C. § 6c(b) and 17 C.F.R. § 33.10. In simple terms, these provisions make it unlawful to defraud or make a false statement to another person in connection with an offer to enter into or the execution of a commodity option transaction. To prove its claim for options fraud, the CFTC must establish that "(a) [Donelson] made a misrepresentation, misleading statement, or a deceptive omission; (b) acted with scienter; and (c) the misrepresentation or omission is material." *CFTC v. Caniff*, 2020 WL 956302, at *7 (N.D. Ill. Feb. 27, 2020). Proof of customer reliance is not required. *See Slusser v. CFTC*, 210 F.3d 783, 785-86 (7th Cir. 2000).

"Whether a misrepresentation has been made depends on the 'overall message' and the 'common understanding of the information conveyed.'" *CFTC v. Kratville*, 796 F.3d 873, 892 (8th Cir. 2015) (quoting *CFTC v. R.J. Fitzgerald & Co., Inc.*, 310 F.3d 1321, 1328 (11th Cir. 2002)). Thus, the Court considers how the message would be interpreted by an objectively reasonable person. *Id*. The CFTC may establish scienter by showing the defendant intended to defraud, manipulate, or deceive, or if the defendant's conduct constituted an extreme departure from the ordinary standard of care." *Id*. at 893; *see also R.J. Fitzgerald*, 310 F.3d at 1328 ("[S]cienter is met when Defendant's conduct involves 'highly unreasonable omissions or representations … that present a danger of misleading [customers] which is either known to the

12

Defendant or so obvious that Defendant must have been aware of it.'"). "A representation or omission is 'material' if a reasonable investor would consider it important in deciding whether to make an investment." *R.J. Fitzgerald*, 310 F.3d at 1328-29.

According to the CFTC, Donelson committed options fraud in at least three different ways. First, Donelson fraudulently omitted the fact that almost all Long Leaf customers who participated in TMM lost money on their investments. Second, the "track record" information Donelson provided to various customers and prospective customers was false or misleading. Third, Donelson's statements touting his trading experience were misleading to customers. The CFTC also contends that Donelson directed Long Leaf APs to solicit customers by similar fraudulent means.

This Court agrees that failing to disclose information regarding Long Leaf customers' losses was a material omission. A reasonable investor would want to know that the person or firm to whom she is entrusting her money has a history of losing customers' investments. *See id.* at 1332-33 ("Given the extremely rosy picture for profit potential painted in the Seminar and in the Commercial, a reasonable investor *surely* would want to know—before committing money to a broker—that 95% or more of RJFCO investors lost money."); *CFTC v. Risk Capital Trading Grp., Inc.*, 452 F. Supp. 2d 1229, 1246-47 (N.D. Ga. 2006) ("It therefore was a material omission on Siegel's part not to disclose Risk Capital's general track record when he knew that the trading advisors to whom customers would be transferred lost money the vast majority of the time.); *see also CFTC v. Commonwealth Fin. Grp., Inc.*, 874 F. Supp.

Short Appendix013

1345, 1353-54 (S.D. Fla. 1994) (citing same principle and collecting related CFTC administrative guidance). Here, the undisputed facts establish that Long Leaf's trading program was a consistent loser for customers both before and after Donelson took over as CEO. Donelson was aware of this fact, but Long Leaf's customers were kept in the dark.

Donelson's position that failing to disclose customer losses under his predecessor or a prior trading model was reasonable is unavailing for two reasons. First, it approaches the materiality question from the wrong perspective—what matters is not whether Donelson believed he was justified in withholding that information, but whether a reasonable investor would consider it important. *See R&W Tech. Servs. Ltd. v. CFTC*, 205 F.3d 165, 169 (5th Cir. 2000). Second, it wrongly assumes that new leadership or an apparent change in trading strategy would render information about a firm's prior performance irrelevant. But a reasonable investor would be rightfully skeptical about jumping on board with an investment firm that consistently squandered its clients' money in the past, simply because new management had stepped in or a new strategy had been adopted. And in any event, Donelson also failed to tell customers about losses under his leadership and the revamped training model. This information is undoubtedly material.

The scienter element is also satisfied here. As Long Leaf's CEO, Donelson was intimately familiar with the firm's poor trading performance using TMM but did not pass that information on to customers. *Cf. Commonwealth Fin. Grp.*, 874 F. Supp. at 1354-55 (finding scienter element satisfied where firm directors and salespeople were

14

aware of customer losses but did not disclose this information). He directed Long Leaf APs to withhold this information even when customers explicitly requested it, apparently in reliance on a policy that he was fully capable of changing or disregarding (as eventually occurred in 2019). And when Donelson *did* send "track record" information to customers, it consisted of a subset of trades selected retrospectively for profitability, with no mention of the overall losses most customers were seeing at the same time. This supports the conclusion that Donelson knowingly withheld information about Long Leaf's poor performance, or at least acted with reckless disregard for the truth. *See CFTC v. Matrix Trading Grp., Inc.*, 2002 WL 31936799, at *8 (S.D. Fla. Oct. 3, 2002) (finding scienter element satisfied where firm's principals made profitability claims despite knowing 92% of firm's customers lost money).

Donelson's response cites to an affidavit from John Burnside, a purported expert in option trading and strategy. *See* R. 96-3. Burnside opines, in summary, that the trading strategy practiced under Donelson's leadership could viably turn a profit and was reasonable given the trading environment. Setting aside whether Burnside's opinion has merit, it is irrelevant. Even if the TMM program *could* have made money, and even if Donelson believed in good faith that it *should* have been making money, it was not. Donelson's supposed confidence in Long Leaf's trading model does not change the fact that it had a consistently poor track record that he knowingly withheld from customers. Optimism about the future does not excuse making false statements about the present or past.

15

The Court likewise finds that the "track record" documents Donelson created and distributed to customers, either himself or through Long Leaf APs, were material misrepresentations. The parties quibble over whether the trades reflected in these documents were "hypothetical" or "cherry-picked" or simply selected to demonstrate the viability of the model. But even if the Court credits Donelson's position that the trades shown in these documents actually occurred and collectively turned a profit, they nonetheless amount to a woefully incomplete picture of Long Leaf's performance, given that the firm's TMM customers collectively lost hundreds of thousands of dollars over the same time frame. Even accurate statements can be misleading if presenting them without context paints an incomplete and inaccurate picture. *See Kratville*, 796 F.3d at 892. Here, it was patently misleading to present customers with a profitable subset of trades while omitting the much larger universe of Long Leaf's losing trades.

The same logic applies to Donelson's statements about his trading experience. What Donelson told customers about his experience—that he had 10 years of financial industry experience with large proprietary traders—may have been accurate on its face, but it was nonetheless deceptive because he was not in a trading position with those companies, and his only actual option trading experience was a substantial loss on a single trade. Donelson never told customers these facts, and tellingly, he testified that he didn't think customers would have wanted to take his trading recommendations if they knew he had no profitable trading experience. R. 82-5, at 81:19-23. Any reasonable jury would be compelled to find a fraudulent

misrepresentation based on this evidence. *See CFTC v. McLaurin*, 1996 WL 385334, at *3 (N.D. Ill. July 3, 1996) (granting summary judgment for CFTC on fraud claim where defendant misrepresented his qualifications and trading experience).

The CFTC also seeks to hold Donelson liable for statements made by Long Leaf APs telling customers about "target" return rates of 6 to 12 percent and touting a "statistical likelihood of success." Donelson says these statements could not have been misleading because they were obviously hypothetical, not outright promises. But Courts have scrutinized similar statements about profit potential or the likelihood of positive returns, notwithstanding their "hypothetical" character. *See Kratville*, 796 F.3d at 895 (noting that statements obscuring the distinction between the possibility and probability of profit may be misleading); *SEC v. Kirkland*, 521 F. Supp. 2d 1281, 1298 (M.D. Fla. 2007) ("Even though the cash flow sheet and the ads often utilized the single words "projected" or "estimated," projections are nonetheless actionable as misrepresentations if there is no reasonable basis to support them."). Even if Donelson and the Long Leaf APs did not explicitly promise returns of 6-12 percent, it was misleading to imply that such returns were likely while knowing the firm in fact consistently lost money for its customers. There is no evidence in the record to suggest customers frequently, if ever, achieved those types of returns.

For these reasons, the Court finds that Donelson has not shown that a genuine issue of material fact exists as to the options fraud claim against him in Count I. The CFTC is entitled to summary judgment on that claim.

Short Appendix017

### b.  CTA Fraud

The CTA fraud claim in Count II arises under 7 U.S.C. § 6*o*(1). Section 6*o* prohibits fraud by a CTA, which the Commodity Exchange Act defines as a person (or entity) who, "for compensation or profit, engages in the business of advising others … as to the value of or advisability of trading in" commodity options, including futures contracts. 7 U.S.C. § 1a(12)(A)(i). "Courts interpret the definition of a CTA liberally." *CFTC v. Equity Fin. Grp., LLC*, 2007 WL 1098754, at *3 (D.N.J. Mar. 30, 2007). Section 6*o*(1)(A) requires proof of a false or misleading statement or omission of material fact, made with scienter. *Commodity Trend Serv., Inc. v. CFTC*, 233 F.3d 981, 993 (7th Cir. 2000). Section 6*o*(1)(B) does not require proof of scienter, but prohibits any course of conduct by a CTA that "operates as a fraud or deceit" on a customer or prospective customer. *Id.* at 993-94.

There is no question that Long Leaf engaged in the business of advising clients on options trading for compensation. Donelson nonetheless disputes that Long Leaf qualified as a CTA. According to Donelson, the CEA and National Futures Association (a self-regulatory organization of the derivatives industry) require that an entity must have discretion over a customer's account (such as the ability to make trades on a customer's account without first contacting the customer) to be considered a CTA. Donelson cites no law or other authority for this proposition,[5] and the Court finds no predicate for this requirement in the CEA language defining a CTA. Courts

---

[5] Donelson references an NFA publication concerning "Registration as a CTA," which is a separate issue.

18

appear to routinely apply the CTA definition to entities that only provide recommendations to clients (as Donelson and Long Leaf did here). *See, e.g.*, *Gunderson v. ADM Inv'r Servs., Inc.*, 85 F. Supp. 2d 892, 910-11 (N.D. Iowa 2000); *CFTC v. AVCO Fin. Corp.*, 979 F. Supp. 232, 236-37 (S.D.N.Y. 1997). Long Leaf plainly meets the statutory definition of a CTA.

Donelson is liable for CTA fraud perpetrated by Long Leaf because, as CEO, he was a controlling person. 7 U.S.C. § 13c(b). Donelson claims to have acted in good faith with regard to the trading strategies employed by Long Leaf, again citing to the Burnside affidavit. But as explained above, the Burnside affidavit is irrelevant to the fraud claims leveled against Donelson and Long Leaf. The CFTC is therefore entitled to summary judgment on Count II against Donelson.

### c. Fraudulent Advertising by a CTA

Count III arises under 17 C.F.R. § 4.41, which makes it unlawful for a CTA or principal thereof to advertise in a manner that "employs any device, scheme or artifice to defraud any participant or client or prospective participant or client," or "involves any transaction, practice or course of business which operates as a fraud or deceit upon any participant or client or any prospective participant or client." Courts have observed that the language in Rule 4.41(a) is substantially the same as the language in section 6*o*(1), construing advertising conduct that violates the latter to also violate the former. *See, e.g.*, *CFTC v. Arrington*, 998 F. Supp. 2d 847, 871 (D. Neb. 2014), *aff'd sub nom. Kratville*, 796 F.3d 873; *CFTC v. Heffernan*, 2006 WL 2434015, at *6-7 (D.S.C. Aug. 21, 2006).

Short Appendix019

Donelson does not meaningfully respond to this count beyond reiterating his other arguments, claiming this portion of the CFTC's motion is "so unclear that it is near impossible to respond." The Court finds no such difficulty. Long Leaf, through its principal and APs, advertised its services via fraudulent means as described above. Donelson is liable as Long Leaf's controlling person. The CFTC is therefore entitled to summary judgment as to Count III against Donelson.

### d. Failure to Register as a CTA

In Count IV, the CFTC seeks to hold Donelson liable as a controlling person for Long Leaf's failure to register as a CTA, in violation of 7 U.S.C. § 6m(1). That section requires any person or entity acting as a CTA to register as such if the person or entity makes use of a means or instrumentality of interstate commerce (such as the telephone or internet). Failure to register is a strict liability violation; there is no scienter requirement. *CFTC v. JBW Capital*, 812 F.3d 98, 106 (1st Cir. 2016).

It is beyond dispute that Long Leaf was acting as a CTA and was making use of various instrumentalities of interstate commerce. However, Donelson argues Long Leaf was exempt from the registration requirement under 17 C.F.R. § 4.14(a)(6). Rule 4.14(a)(6) exempts a person or entity from CTA registration requirements if "it is registered under the Act as an introducing broker and the person's trading advice is solely in connection with its business as an introducing broker."

The CFTC has issued guidance stating that, "absent special circumstances, the exemption from CTA registration [in Rule 4.14(a)(6)] should not be available to an IB that 'guides' trading in a majority of its customers' accounts." *Clarification of Issues*

20

*Concerning Guided Accounts of Introducing Brokers & Futures Commission Merchants*, CFTCLTR No. 95-82, 1995 WL 707862, at *2 (Sept. 19, 1995). "Guiding" an account in this context refers to an account "that is being informed by the FCM or IB of the particular commodity or futures contract to purchase or sell, the price at which the customer should make the purchase or sale and the number of contracts to buy or sell." *Id.* at *1. This is an apt description of Long Leaf's conduct. Long Leaf "guided" its TMM customers' accounts (which encompassed the majority of its customers) by recommending options trades, and in doing so was "acting primarily as a CTA." *Id.* at *2. Long Leaf did not render advisory services "solely in connection with its business as an IB," so the exemption in Rule 4.14(a)(6) does not apply.

Alternatively, Donelson raises an "advice of counsel" defense, stating that his attorney told him that neither he nor Long Leaf needed to register as a CTA. As the Seventh Circuit has recognized, "[t]here is no such thing as an 'advice of counsel' defense." *United States v. Urfer*, 287 F.3d 663, 665 (7th Cir. 2002). Counsel's advice may be relevant when a criminal statute requires proof the defendant knew he was violating the statute, *id.* at 666, but § 6m(1) has no such requirement. *See JBW Capital*, 812 F.3d at 106 (rejecting a "reliance on professionals defense" to a § 6m violation because it is a "strict liability offense"). As such, any uncertainty on Donelson's part as to whether Long Leaf had to register as a CTA, or qualified as a CTA at all, is irrelevant. The facts are unambiguous and compel a summary judgment ruling in favor of the CFTC on Count IV.

21

### e.  Failure to Make Required CTA Disclosures

Count V asserts that Long Leaf failed to make certain disclosures as required by 17 C.F.R. §§ 4.31(a), (b), and 4.36(d)(1), and seeks to hold Donelson liable as the controlling person. Donelson disputes the factual premise underpinning this Count as "unintelligible"—it appears the CFTC's statement of fact was submitted in somewhat garbled form. *See* R. 77-1 ¶ 52 ("Long Leaf did not provide disclosures required by 17 C.F.R. § 4.31(a) to customers or prospective customers required by." [sic]). However, this statement cites to Donelson's Answer, in which he admits that Long Leaf did not provide the purportedly required CTA disclosures but denies that it was required to register as a CTA or provide said disclosures. R. 30 ¶ 34. Because the Court has already found that Long Leaf qualified as a CTA, it was required to provide all the attendant disclosures, and the undisputed facts show that it did not. Summary judgment is granted to the CFTC on Count V against Donelson.

### f.  Failure to Register as an AP

Finally, Count VI asserts that Donelson failed to timely register as an AP, in violation of 7 U.S.C. § 6k(1). That provision requires registration for any person associated with an IB in a capacity that involves the solicitation or acceptance of customers' orders or the supervision of any person or persons so engaged. It is undisputed that Donelson, as CEO, occupied such a role, but was not registered for several months between December 2017 and May 2018. Donelson does not offer a discrete response to this Count in his opposition.

Short Appendix022

The CFTC also contends Donelson is liable for allowing another Long Leaf employee, Andrew Nelson, to act as a Long Leaf AP without proper registration. However, the Court finds the facts supporting this allegation unclear (they are premised solely on the CFTC's pleadings and Donelson's somewhat muddled admissions) and therefore declines to grant summary on this basis. Nonetheless, Donelson's own failure to register is sufficient to warrant summary judgment for the CFTC on Count VI.

### g. Restitution and Disgorgement

The CFTC in its motion also seeks equitable remedies against Donelson ordering restitution and disgorgement. 7 U.S.C. § 13a-1(d)(3) permits the Court to impose equitable remedies including "(A) restitution to persons who have sustained losses proximately caused by such violation (in the amount of such losses); and (B) disgorgement of gains received in connection with such violation." Obtaining restitution relief ordinarily requires proof of investors' individual reliance. *CFTC v. Driver*, 877 F. Supp. 2d 968, 980 (C.D. Cal. 2012). However, the Court may presume reliance by customers if the violations involve "material omissions in the context of a fraudulent scheme," *CFTC v. Ross*, 2014 WL 6704572, at *2 (N.D. Ill. Nov. 26, 2014), or "pervasive or widespread misrepresentation," *Driver*, 877 F. Supp. 2d at 980. A controlling person who knowingly induces the acts constituting a violation may be held liable to the same extent as the violating entity. § 13c(b).

As discussed above, Donelson was a controlling person of Long Leaf and personally participated in or directed the acts that make up the violations. He is

23

therefore jointly and severally liable for Long Leaf's violations during his tenure as CEO. *See* § 13c(b). Donelson does not dispute the total amount of TMM participant losses during his tenure as CEO, nor does he raise any other argument in opposition to the CFTC's restitution claim in his brief. Because the undisputed evidence establishes that TMM customer losses were pervasive and resulted at least in part from fraudulent omissions, ordering restitution in the amount of customer losses during Donelson's tenure ($2,376,738, inclusive of paid commissions) is proper. *See Ross*, 2014 WL 6704572, at *2-3. Disgorgement of Long Leaf's collected commissions during the same period, totaling $1,235,413, is also appropriate. *See CFTC v. Escobio*, 833 F. App'x 768, 772 (11th Cir. 2020) (affirming order for disgorgement of the full value of commissions charged to customers). The amount owed in disgorgement shall be offset by any sums paid toward restitution.

## II.    Claims against Ruth

The CFTC seeks summary judgment on two claims against Ruth. Count I asserts an options fraud claim akin to Count I against Donelson, described above. Count II alleges that Ruth is liable for aiding and abetting Long Leaf's CTA fraud.

### a.    Options Fraud

The CFTC's options fraud claim against Ruth partly follows its claim against Donelson. The CFTC contends that Ruth's failure to tell his clients and prospective clients that substantially all TMM customers lost money was a material omission. It also argues Ruth's scripted statements suggesting returns of 6 to 12 percent were

"easy" to achieve with "strong statistical likelihood" were fraudulent given the program's dismal track record.

The Court finds Ruth's failure to inform customers about Long Leaf's history of investment losses was a fraudulent omission for the same reasons discussed above in connection with the claim against Donelson. Ruth raises the same argument that information about TMM's past performance was irrelevant, which the Court has already rejected. Ruth further suggests that providing information on historical results would have been a violation of NFA and CFTC regulations. This assertion is not only illogical, but is unsupported by any legal authority. The Court is highly skeptical of its accuracy given that CFTC regulations in fact *require* extensive disclosures about a trading program's past performance, not to mention the many cases cited in this opinion in which courts have condemned an advisor's failure to provide such information. *See, e.g.*, 17 C.F.R. § 4.35 (setting forth required performance disclosures); *Commonwealth Fin. Grp.*, 874 F. Supp. at 1353-54.

Ruth also disputes some of the factual support for the CFTC's motion, but the evidence—including his testimony—does not create a genuine issue of material fact that would preclude summary judgment. Ruth testified that all TMM customers got the same four trade recommendations each month, belying his argument that the CFTC has not shown across-the-board losses for TMM customers. R. 76-21, at 102:1-6. Ruth's arguments amount to a "small sample size" claim that the CFTC is wrongly extrapolating broad losses from a few customer accounts. But nowhere does Ruth identify any evidence in the record to dispute that most Long Leaf customers lost

25

money (as evidenced by his own trade monitoring and an analysis from the CFTC's investigator), making these examples representative of TMM's overall performance.

Ruth's statements about a targeted 6 to 12 percent return and the "strong statistical likelihood" of success are likewise misleading for the same reasons discussed above. It is of no moment that the statements were framed as "hypothetical" or may have only reflected a trading "philosophy." *See Kirkland*, 521 F. Supp. 2d at 1298. The evidence shows that if *any* TMM customer achieved returns on the level Ruth described, it was a statistical anomaly, not a reliable result of Long Leaf's recommendations. Telling customers otherwise created a false sense of confidence that had no reasonable basis in fact.

The evidence also establishes scienter. Ruth admitted that he "frequently" received customer complaints regarding poor account performance, and he tracked the performance of Long Leaf's trading recommendations for several months, consistently showing losses. Ruth's claim that he "was not aware of how to interpret" customer account statements is neither credible nor helpful. R 97 ¶ 29. Ruth had passed his Series 3 broker exam before starting at Long Leaf, R. 98 ¶ 1, and he told other customers that he could see all his clients' results, making it "very easy for me to be almost certain about our ability to get you to reach your financial goals." R. 97 ¶ 25. No reasonable jury could conclude that Ruth was unable to determine whether his clients had lost or gained money on their accounts. And if Ruth was truly incapable of understanding customer account statements, his sales pitches about customer returns were simply hot air. The evidence compels a finding that Ruth made

Short Appendix026

misleading statements and omissions about the performance of Long Leaf's trading program with full knowledge of its consistent history of losses.

Ruth's assertions about the relative experience of Long Leaf's customers and the various other disclosures they received are neither supported by evidence nor relevant. "The experience level of a customer does not vitiate the materiality of misrepresentations." *Matrix Trading Grp.*, 2002 WL 31936799, at *7. Furthermore, to the extent Ruth means to argue that Long Leaf's customers could not have reasonably relied on the misrepresentations, reliance is not an element of the CFTC's claims. *Slusser*, 210 F.3d at 786.

Because no genuine issue of material fact exists as to the CFTC's options fraud claim against Ruth, it is entitled to summary judgment on Count I.

**b.  Aiding and Abetting Long Leaf's CTA Fraud**

Count II against Ruth alleges he aided and abetted Long Leaf's violation of the CEA under § 13c(a). To be liable for aiding and abetting, a defendant must knowingly associate himself with an unlawful venture, participate in it, and seek by his actions to make it succeed. *CFTC v. Hunter Wise Commodities, LLC*, 21 F. Supp. 3d 1317, 1348 (S.D. Fla. 2014).

In opposition to Count II, Ruth incorporates Donelson and Long Leaf's arguments that Long Leaf was not a CTA. Technically, there is nothing to incorporate, as Donelson disclaimed any position on whether Long Leaf was a CTA during the time Ruth was employed there, R. 96, at 7 n.4, and Long Leaf submitted no opposition to the CFTC's motion. But in any event, the Court has already

27

concluded that Long Leaf was operating as a CTA based on the undisputed facts encompassing the time Ruth worked there.

Alternatively, Ruth says he is not liable for aiding and abetting CTA fraud because Ruth did not know Long Leaf was committing or intended to commit fraud. He merely made statements according to a provided script, which he apparently knew were approved by Long Leaf's compliance officer and believed had been approved by the NFA. The Seventh Circuit has rejected this type of "I am just a copying machine" defense. *See SEC v. Lyttle*, 538 F.3d 601, 604 (7th Cir. 2008) ("One doesn't have to be the inventor of a lie to be responsible for knowingly repeating it to a dupe."). The Court has already concluded that Ruth knowingly made misleading statements to customers and fraudulently omitted material information. The fact that the precise words he used may have been written or blessed by someone else is insufficient to avoid liability. Summary judgment in favor of the CFTC on Count II is proper.

### c. Restitution and Disgorgement

As with Donelson, the CFTC seeks equitable remedies in the form of an order for restitution and disgorgement against Ruth. And as with Donelson, Ruth has offered no arguments in opposition to this request beyond contesting the underlying violations themselves. Therefore, for the same reasons discussed above, the Court finds that an order of restitution and disgorgement is appropriate as to Ruth, in the amount of $301,541,39. This reflects his compensation for work at Long Leaf, comprised primarily of ill-gotten commissions from customers, and should be repaid to customers as such.

28

### III.    Claims against Long Leaf

The CFTC's motion as to Long Leaf seeks summary judgment on six Counts, largely tracking it claims against Donelson and premised on essentially the same facts. Long Leaf itself filed no opposition to the CFTC's motion.[6] Regardless, the analysis of the claims against Donelson and Ruth applies with equal force to Long Leaf, which acts through its principals and APs. Long Leaf failed to inform its customers of the poor performance of TMM participants' investments and made misleading statements suggesting a likelihood of positive returns with no reasonable basis to do so.

The facts also clearly demonstrate that Long Leaf was acting as a CTA but unlawfully failed to register as such, and failed to make the required customer disclosures in connection with its offering of a trading program. Finally, having found that Donelson unlawfully failed to register as a Long Leaf AP, *see supra*, Long Leaf is liable for permitting him to become or remain associated while knowing (or in circumstances where it should have known) he was not so registered. 7 U.S.C. § 6k(1).

Given these findings, the Court also orders Long Leaf to pay $5,767,145 in restitution and $4,010,994 in disgorgement. The amount owed in disgorgement shall be offset by any sums paid toward restitution. Both totals shall also be offset by any

---

[6] Because the motions as to Donelson and Long Leaf are so similar, Donelson's response covers much of the same ground as Long Leaf's response likely would have covered, though Donelson explicitly disclaims any position on allegations outside the time he was Long Leaf's CEO.

Short Appendix029

sums paid toward the restitution and disgorgement amounts, respectively, imposed against Donelson jointly and severally with Long Leaf.

## Conclusion

For the foregoing reasons, the CFTC's motions for partial summary judgment against James Donelson [R. 77], Jeremy Ruth [R. 76], and Long Leaf Trading Group [R. 79] are granted. Long Leaf is ordered to pay $5,767.145 in restitution and $4,010,994 in disgorgement. Donelson shall be considered jointly and severally liable with Long Leaf for $2,376,738 in restitution and $1,235,413 in disgorgement. Any amount owed by a party in disgorgement shall be offset by all sums paid toward restitution. Ruth is ordered to pay $301,541.39, constituting both restitution and disgorgement.

ENTERED:

*Thomas M Durkin*

Honorable Thomas M. Durkin
United States District Judge

Dated: July 27, 2022

Short Appendix030

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| Commodity Futures Trading Commission, | ) | |
| Plaintiff | ) | |
| | ) | **Case No. 20-cv-3758** |
| v. | ) | |
| | ) | **Judge Thomas M. Durkin** |
| Long Leaf Trading Group, Inc., James A. | ) | |
| Donelson, Timothy M. Evans, Jeremy S. | ) | |
| Ruth, and Andrew D. Nelson, | ) | |
| Defendants | ) | |
| | ) | |

**FINAL JUDGMENT**

Final judgment is hereby ENTERED in favor of Plaintiff Commodity Futures Trading

Commission ("Commission" or "CFTC") and against Defendants Long Leaf Trading Group, Inc.

("Long Leaf"), James A. Donelson, Jeremy S. Ruth, Timothy M. Evans, and Andrew D. Nelson

(collectively, "Defendants"), on all counts.  The Court's judgments as to liability against these

Defendants were previously entered on the CFTC's various summary judgment motions, motions

for supplemental relief, and motions for default judgment.  (Docs. 106, 118, 122.)

It is hereby ORDERED AND ADJUDGED as follows:

**I.  PERMANENT INJUNCTION**

1.     Defendants, along with their affiliates, agents, servants, employees, successors,

assigns, attorneys, and all persons in active concert with them, are permanently enjoined and

prohibited from directly or indirectly:

a.     Trading on or subject to the rules of any registered entity (as that term is defined

by Section 1a(40) of the Commodity Exchange Act ("Act"), 7 U.S.C. § 1a(40));

b.      Entering into any transaction involving "commodity interests" (as that term is

defined in CFTC Regulation 1.3, 17 C.F.R. § 1.3), for accounts held in the name

of any Defendant or for accounts in which any Defendant has a direct or indirect

interest;

c.      Having any commodity interests traded on any Defendant's behalf;

d.      Controlling or directing the trading for or on behalf of any other person or entity,

whether by power of attorney or otherwise, in any account involving commodity

interests;

e.      Soliciting, receiving, or accepting any funds from any person for the purpose of

purchasing or selling of any commodity interests; and

f.      Acting as a principal (as that term is defined in Regulation 3.1(a), 17 C.F.R.

§ 3.1(a), agent, or any other officer or employee of any person registered,

exempted from registration, or required to be registered with the CFTC except as

provided for in 17 C.F.R. § 4.14(a)(9).

2.      Defendant Long Leaf Trading Group, Inc., and its affiliates, agents, servants,

employees, successors, assigns, attorneys, and all persons in active concert with it, who receive

actual notice of such order by personal service or otherwise, are hereby enjoined and prohibited

from engaging in the conduct described in the Complaint (Doc. 1), in violation of 7 U.S.C. §§

6c(b), 6k(1), 6m(1), 6o, and 17 C.F.R. §§ 4.31(a), (b), 4.36(d)(1), 4.41(a), 33.3(b)(2), 33.10.

3.      Defendant James A. Donelson and his affiliates, agents, servants, employees,

successors, assigns, attorneys, and all persons in active concert with him, who receive actual

notice of such order by personal service or otherwise, are hereby enjoined and prohibited from

engaging in the conduct described in the Complaint, in violation of 7 U.S.C. §§ 6c(b), 6k(1),

2

6m(1), and 6o, and 17 C.F.R. §§ 3.12(a), 4.31(a), (b), 4.36(d)(1), 4.41(a), 33.3(b)(1), (2), and

33.10.

4.      Defendant Timothy M. Evans, and his affiliates, agents, servants, employees,

successors, assigns, attorneys, and all persons in active concert with him, who receive actual

notice of such order by personal service or otherwise, are hereby enjoined and prohibited from

engaging in the conduct described in the Complaint, in violation of 7 U.S.C. §§ 6c(b), 6k(1),

6m(1), and 6o, and 17 C.F.R. § 4.31(a), (b), 4.36(d)(1), 4.41(a), 33.3(b)(2), and 33.10.

5.      Defendant Jeremy Ruth, and his affiliates, agents, servants, employees,

successors, assigns, attorneys, and all persons in active concert with him, who receive actual

notice of such order by personal service or otherwise, are hereby enjoined and prohibited from

engaging in the conduct described in the Complaint, in violation of 7 U.S.C. §§ 6c(b), 6o, and 17

C.F.R. § 33.10.

6.      Defendant Andrew D. Nelson, and his affiliates, agents, servants, employees,

successors, assigns, attorneys, and all persons in active concert with him, who receive actual

notice of such order by personal service or otherwise, are hereby enjoined and prohibited from

engaging in the conduct described in the Complaint, in violation of 7 U.S.C. §§ 6c(b), 6k(1), 6o,

and 17 C.F.R. §§ 3.12(a), 33.10, 33.3(b)(1).

## II.  MONETARY RELIEF

### A.    RESTITUTION

7.      Defendants, as well as any successors thereof, shall make full restitution to every

person who has sustained loses proximately caused by Defendants' violations of the Act and

Regulations as described in the Complaint, including post-judgment interest, ("Restitution

Obligation") as follows:

3

a.    Defendant Long Leaf Trading shall pay restitution in the amount of $5,767,145.

b.    Defendant James A. Donelson shall pay restitution in the amount of $2,376,738.
Donelson is jointly and severally liable with Long Leaf Trading for this amount.

c.    Defendant Timothy M. Evans shall pay restitution in the amount of $3,390,407.
Evans is jointly and severally liable with Long Leaf Trading for this amount.

d.    Defendant Jeremy S. Ruth shall pay restitution in the amount of $301,541.39.

e.    Defendant Andrew D. Nelson shall pay restitution in the amount of $26,356.

8.    To effect payment of the Restitution Obligation and the distribution of any restitution payments to Defendants' customers, the Court appoints the National Futures Association ("NFA") as Monitor ("Monitor").  The Monitor shall receive restitution payments from Defendants and make distributions as set forth below.  Because the Monitor is acting as an officer of this Court in performing these services, the NFA shall not be liable for any action or inaction arising from NFA's appointment as Monitor, other than actions involving fraud.

9.    Defendants shall make Restitution Obligation payments, and any post-judgment interest payments, under this Order to the Monitor in the name "Long Leaf Trading Restitution Fund" and shall send such payments by electronic funds transfer, or by U.S. postal money order, certified check, bank cashier's check, or bank money order, to the Office of Administration, National Futures Association, 300 South Riverside Plaza, Suite 1800, Chicago, Illinois 60606 under cover letter that identifies the paying Defendant and the name and docket number of this proceeding.  Defendants shall simultaneously transmit copies of the cover letter and the form of payment to the Chief Financial Officer, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, NW, Washington, D.C. 20581.

Short Appendix034

10.     The Monitor shall oversee the Restitution Obligation and shall have the discretion to determine the manner of distribution of such funds in an equitable fashion to Defendants' customers identified by the Commission or may defer distribution until such time as the Monitor deems appropriate.  In the event that the amount of Restitution Obligation payments to the Monitor are of a *de minimis* nature such that the Monitor determines that the administrative cost of making a distribution to eligible customers is impractical, the Monitor may, in its discretion, treat such restitution payments as civil monetary penalty payments, which the Monitor shall forward to the Commission following the instructions for civil monetary penalty payments set forth in Part II.C. below.

11.     Defendants shall cooperate with the Monitor as appropriate to provide such information as the Monitor deems necessary and appropriate to identify Defendants' customers whom the Monitor, in its sole discretion, may determine to include in any plan for distribution of any Restitution Obligation payments.  Defendants shall execute any documents necessary to release funds that they in any repository, bank, investment or other financial institution, wherever located, in order to make partial or total payment toward the Restitution Obligation.

12.     The Monitor shall provide the Commission at the beginning of each calendar year with a report detailing the disbursement of funds to Defendants' customers during the previous year.  The Monitor shall transmit this report under a cover letter that identifies the name and docket number of this proceeding to the Chief Financial Officer, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, NW, Washington, D.C. 20581.

13.     The amounts payable to each customer shall not limit the ability of any customer from proving that a greater amount is owed from any Defendant or any other person or entity,

Short Appendix035

and nothing herein shall be construed in any way to limit or abridge the rights of any customer

that exist under state or common law.

14.     Pursuant to Rule 71 of the Federal Rules of Civil Procedure, each customer of

Defendants who suffered a loss is explicitly made an intended third-party beneficiary of this

Order and may seek to enforce obedience of this Order to obtain satisfaction of any portion of

the restitution that has not been paid by Defendants to ensure continued compliance with any

provision of this Order and to hold Defendants in contempt for any violations of any provision of

this Order.

15.     To the extent that any funds accrue to the U.S. Treasury for satisfaction of

Defendants' Restitution Obligation, such funds shall be transferred to the Monitor for

disbursement in accordance with the procedures set forth above.

**B.     DISGORGEMENT**

16.     Defendants, as well as any third-party transferee and/or successors thereof, shall

disgorge all benefits received including, but not limited to, salaries, commissions, loans, fees,

revenues, and trading profits derived, directly or indirectly, from acts or practices which

constitute violations of the Act and Regulations as described in the Complaint, including post-

judgment interest, ("Disgorgement Obligation") as follows:

a.     Defendant Long Leaf Trading shall pay disgorgement in the amount of

$4,010,994.

b.     Defendant James A. Donelson shall pay disgorgement in the amount of

$1,235,413.  Donelson is jointly and severally liable with Long Leaf Trading for

this amount.

6

c.      Defendant Timothy M. Evans shall pay disgorgement in the amount of

$3,083,978.  Evans is jointly and severally liable with Long Leaf Trading for this

amount.

d.      Defendant Jeremy S. Ruth shall pay disgorgement in the amount of $301,541.39.

e.      Defendant Andrew D. Nelson shall pay disgorgement in the amount of $26,356.

17.      Any amount owed in disgorgement by any Defendant shall be offset by any sum

paid by that Defendant toward restitution.  Any amount owed in disgorgement by any Defendant

shall be offset by any sum paid by another Defendant with whom any Defendant is jointly or

severally liable.

18.      Defendant shall pay their respective Disgorgement Obligations and any post-

judgment interest by electronic funds transfer, U.S. postal money order, certified check, bank

cashier's check, or bank money order.  If payment is to be made other than by electronic funds

transfer, then the payment shall be made payable to the Commodity Futures Trading

Commission and sent to the address below:

MMAC/ESC/AMK326
Commodity Futures Trading Commission
Division of Enforcement
6500 S. MacArthur Blvd.
HQ Room 181
Oklahoma City, OK 73169
(405) 954-6569 office
(405) 954-1620 fax
9-AMC-AR-CFTC@faa.gov

19.      If payment by electronic funds transfer is chosen, Defendants shall contact Marie

Thorne or her successor at the address above to receive payment instructions and shall fully

comply with those instructions.  Defendants shall accompany payment of the Disgorgement

Obligation with a cover letter that identifies Defendants and the name and docket number of this

proceeding.  Defendant shall simultaneously transmit copies of the cover letter and the form of

payment to the Chief Financial Officer, Commodity Futures Trading Commission, Three

Lafayette Centre, 1155 21st Street, NW, Washington, D.C. 20581.

**C.     CMP**

20.     Each Defendant shall pay a civil monetary penalty ("CMP Obligation") as

follows:

a.     Defendant Long Leaf Trading shall pay a CMP in the amount of $1,387,790.50.

b.     Defendant James A. Donelson shall pay a CMP in the amount of $617,706.50.

c.     Defendant Timothy M. Evans shall pay a CMP in the amount of $9,251,934.

d.     Defendant Jeremy S. Ruth shall pay a CMP in the amount of $150,770.50.

e.     Defendant Andrew D. Nelson shall pay a CMP in the amount of $199,094.

21.     Payment of the CMP by any Defendant shall be affected in the same manner as

payment of the Disgorgement Obligation, as set forth in Paragraph 18.

### III.  OTHER PROVISIONS

22.     Partial Satisfaction:  Acceptance by the Commission or the Monitor of any partial

payment of any Defendant's Restitution Obligation, Disgorgement Obligation, or CMP

Obligation shall not be deemed a waiver of its obligation to make further payments pursuant to

this Order, or a waiver of the Commission's right to seek to compel payment of any remaining

balance.

23.     Continuing Jurisdiction of this Court:  This Court shall retain jurisdiction of this

action to ensure compliance with this Order and for all other purposes related to this action,

including any motion by Defendants to modify or for relief from the terms of this Order.

24.     Injunctive and Equitable Relief Provisions: The injunctive and equitable relief provisions of this Order shall be binding Defendants, upon any person under the authority or control of any of the Defendants, and upon any person who receives actual notice of this Order, by personal service, e-mail, facsimile or otherwise insofar as he or she is acting in active concert or participation with Defendants.

There being no just reason for delay, the Clerk of the Court is hereby ordered to enter this FINAL JUDGMENT forthwith and without further notice.

Dated: March 29, 2023

*Thomas M Durkin*
_____
Thomas M. Durkin
United States District Judge

Short Appendix039